**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

SCHUR INTERNATIONAL A/S, a Denmark Corporation,

Plaintiff,

vs.

ROBERT MILLER, an individual,

Defendant.

CASE NO. 12CV2745 WQH (JMA)

**ORDER**

HAYES, Judge:

The matter before the Court is the Motion to Dismiss filed by Defendant Robert Miller. (ECF No. 6).

**PROCEDURAL BACKGROUND**

On November 13, 2012, Plaintiff Schur International A/S initiated this action with a Complaint against Defendant Robert Miller "for breach of written representation that Defendant made to [Plaintiff] in a written settlement agreement." (ECF No. 1 at ¶ 1).

On January 9, 2013, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 6). On February 5, 2013, Plaintiff filed an opposition (ECF No. 7), and on February 8, 2013, Defendant filed a reply (ECF No. 8).

//

**ALLEGATIONS OF THE COMPLAINT**

Schur Marketing & Technologies, U.S.A., Inc. ("SMT"), the company of which Defendant was formerly President and CEO, was a manufacturer and distributer of ice and water vending machines that did business at several retailers, including Ralphs. Those retailers provided locations for SMT vending machines in exchange for commissions on the vending machine sales. *Id.* at ¶ 7. "Originally, SMT's legal name was Bottle Water Vending, Inc., which was both owned and run by [Defendant]." *Id.* at ¶ 8.

"In 2008, Bottle Water Vending, Inc. entered into a written debt financing agreement with [Plaintiff], through which [Plaintiff] became 45% owner of Bottle Water Vending, Inc. The Company's name was changed to SMT on March 12, 2008." *Id*. "Following the transaction with [Plaintiff], Defendant ... was 55% owner, as well as President and CEO, of SMT." *Id.*

**I. Defendant enters contract with Ralphs**

In 2009, Defendant, "as President and CEO, negotiated and signed a contract with Ralphs on behalf of SMT." *Id.* at ¶ 9; *see also id.*, Exh. A (copy of contract).

> Per the contract, Ralphs would provide locations for SMT's vending machines at a large number of its grocery stores in exchange for a commission on water sales for a three-year period from January 1, 2010, through December 31, 2012.
>
> In the contract, SMT guaranteed Ralphs that it would exceed the revenue of the prior vendor whose place it had taken in the grocery stores. SMT guaranteed that it would exceed the revenues of the prior vendor by 15% in the first year of the contract. It also guaranteed that revenues would increase 5% each subsequent year. Ralphs agreed to provide [Defendant] of SMT with the prior vendor's 2009 revenue figures so that the guarantee could be calculated once SMT had begun to perform under the contract. Ralphs has stated to representatives of [Plaintiff] that it did, in fact, provide such revenue figures to [Defendant] at that time.
>
> Under the terms of the contract, the first year for purposes of comparison commenced when all machines had been installed. Because all machines were installed by the end of Q1 2010, the comparison period was April 2010 to March 2011.
>
> Per the contract, if SMT failed to meet its guaranteed revenue increases for a particular year, it was obligated to pay Ralphs the difference as a guarantee. The amount owed was calculated by multiplying the shortfall in revenues by the amount of commissions Ralphs would have made on the sales that should have been made. Under the terms of the contract, SMT was required to compensate Ralphs for any shortfalls by

April 30th of the following year.

*Id.* at ¶¶ 9-12.

## II. Defendant failed to provide accurate revenue figures

"When SMT's CFO Duke Bushong asked [Defendant] to provide the previous vendor's 2009 revenue figures so that he could calculate the amount owed under the guarantee to Ralphs, [Defendant] told him that Ralphs had not sent him the official figures, but that the previous vendor's 2009 revenue was $4.1 million." *Id.* at ¶ 13. Defendant told Bushong "that he would provide him with the official numbers as soon as Ralphs sent them." *Id.*

> Bushong repeatedly asked [Defendant] for the previous vendor's 2009 revenue figures. [Defendant] maintained that Bushong should use the $4.1 million figure for purposes of his calculations. Because the revenue that SMT began actually producing annually under the contract was close to $4.1 million, Bushong had no reason to believe that anything was wrong with that figure.
>
> At the end of 2010, Bushong used the $4.1 million figure to calculate that SMT owed approximately $77,000 to Ralphs under the guarantee clause for the first year of the contract. This liability was booked in March 2011 at the end of the comparison period. [Defendant] assured Bushong that the entire amount would be offset by credits that he felt should be obtained from Ralphs (for example, due to their closing stores or changing locations).
>
> After a few months, Bushong asked [Defendant] whether SMT needed to pay Ralphs the $77,000 that it owed them under the guarantee clause. He again told Bushong that the entire amount would be offset with alleged credits and that he was in the process of discussing the matter with Ralphs. Accordingly, Bushong noted in his monthly financial report that SMT expected the $77,000 guarantee amount to be reversed.
>
> By March 2012, Bushong calculated that an additional $244,000 was due to Ralphs under the guarantee clause. Around this time, SMT was being audited. SMT had experienced a $9 million loss in 2011, and an auditor was called in to review its financials. Bushong informed the auditor of SMT's guarantee to Ralphs. The auditor told him that because [Defendant] had said the liability would be offset, and because the amount owed was immaterial compared to a $9 million loss, there was no need to book the guarantee.

*Id.* at ¶¶ 14-17.

//

## III. Plaintiff sues Defendant; Defendant enters Settlement Agreement with

**Plaintiff**

"By at least November 2011, SMT had defaulted under the debt financing agreement that it had entered into with [Plaintiff] by failing to pay its debt service as it came due." *Id.* at ¶ 18. On March 28, 2012, Plaintiff filed a lawsuit against Defendant for breach of fiduciary duty, alleging that Defendant "had diverted corporate assets by paying corporate salaries to persons who performed no work for SMT, taking excessive compensation from SMT, and using corporate assets for his own personal use, including paying for his babysitting service." *Id.* at ¶ 19.

On April 10, 2012, Defendant and SMT entered into the written Settlement Agreement. *Id.* at ¶ 20. "As a result of the Settlement Agreement, SMT was dissolved, and [Defendant] was required to transfer the assets and business of SMT to [Plaintiff]." *Id.; see also id.*, Exh. B (copy of Settlement Agreement). "As part of the Settlement Agreement, [Defendant] agreed to provide a true and correct accounting of SMT, including SMT's February 2012 balance sheet and income statement. He also represented in the Settlement Agreement that in the accounting he provided to [Plaintiff], SMT had no liabilities that were not reflected on SMT's balance sheet." *Id.* at ¶ 21. "[Defendant] did not account for the significant liabilities that were owed to Ralphs and instead represented and warranted to [Plaintiff] that there were no such liabilities." *Id.; see also id.*, Exh. C (copies of balance sheet and income statement). "The Settlement Agreement provides for attorneys' fees." *Id.* at ¶ 23.

**IV. Ralphs demands payments**

After Defendant transferred SMT's assets and business to Plaintiff, Defendant "e-mailed Bushong to let him know that he had an appointment with a representative from Ralphs." *Id.* at ¶ 24.

> Before the meeting, Ralphs sent Bushong the month-by-month sales figures from the previous vendor. According to Ralphs, the previous vendor's 2009 revenue was $5 million, not $4.1 million as [Defendant] had insisted. The $5 million revenue figure significantly increased the amount SMT owed Ralphs under the guarantee. Ralphs assured Bushong that they had sent [Defendant] the same numbers years earlier at the inception of the contract.

> At the meeting, Ralphs informed Bushong that SMT was now one year late in paying the first year guarantee. As a result of the meeting and negotiations, [Plaintiff] was forced to cause its wholly-owned subsidiary Schur Consumer Products, Inc., the successor company to SMT, to pay Ralphs $638,411.05 for the first year guarantee and $842,308.00 for the second year guarantee. SMT actually owed $932,742.00 for the second year guarantee, but this amount was offset by other credits. The third year guarantee has not yet been calculated but will have to be paid by [Plaintiff] due to [Defendant]'s misrepresentation.

*Id.* at ¶¶ 24-26. "These figures were not reflected on the SMT balance sheet that [Defendant] provided to [Plaintiff] pursuant to the Settlement Agreement, such that [Defendant]'s representation and warranty as to SMT's liabilities was incorrect." *Id.* at ¶ 26.

**V. Plaintiff sells assets of SMT at a loss**

On October 26, 2012, Plaintiff "sold the assets of SMT (now Schur Consumer Products, Inc.) to Glacier Water Services, Inc. ("Glacier"). As part of that transaction, [Plaintiff] retained all claims against [Defendant] arising out of the Settlement Agreement, including all claims made herein." *Id.* at ¶ 27. "During the negotiations, Glacier stated that they would have been willing to pay more for SMT's assets, but did not do so because of the misrepresentations that [Defendant] had made on SMT's balance sheet. Because of such misrepresentations, Glacier paid [Plaintiff] a lower purchase price for SMT's assets in an amount to be proven at trial." *Id.* at ¶ 28.

**VI. Plaintiff sends letter to Defendant**

"The Settlement Agreement provides that a party claiming breach must provide the breaching party with ten days' written notice." *Id.* at ¶ 29.

On November 1, 2012, counsel for Plaintiff notified Defendant that he was in breach of the Settlement Agreement, and "demanded that [Defendant] compensate [Plaintiff] for the damages it incurred based on [Defendant's] misrepresentations." *Id.; see also id.*, Exh. D (copy of letter from Plaintiff's counsel to Defendant). "The deadline for [Defendant] to comply was November 11, 2012, at 5:00 p.m." *Id.*

On November 9, 2012, Defendant "acknowledged" receiving Plaintiff's letter. *Id.* at ¶ 30. Defendant "has refused to this date to compensate [Plaintiff] for its losses,

thus forcing [Plaintiff] to file this lawsuit." *Id.*

Plaintiff asserts four claims for relief: (1) breach of written contract; (2) fraudulent misrepresentation; (3) fraudulent material nondisclosure/omissions; and (4) negligent misrepresentation. Plaintiff alleges that the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332. *Id.* at ¶ 3. Plaintiff seeks damages, interest on its damages, reasonable attorneys' fees, and costs and disbursements.

Attached to the Complaint, Plaintiff submits copies of the 2009 contract entered into between SMT and Ralphs (ECF No. 1-1, Exh. A), the April 10, 2012 Settlement Agreement entered into between Plaintiff, SMT and Defendant (ECF No. 1-2, Exh. B), the February 2012 balance sheet and income statement that Defendant provided to Plaintiff pursuant to the Settlement Agreement (ECF No. 1-3, Exh. C), and the November 1, 2012 letter that Plaintiff's counsel sent to Defendant (ECF No. 1-4, Exh. D).

**APPLICABLE STANDARD**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides: "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To sufficiently state a claim for relief and survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss, a court must accept as

true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

**DISCUSSION**

Defendant contends that "[t]his is one of those cases in which granting a 12(b)(6) motion to dismiss with prejudice is warranted" because "the terms of the Settlement Agreement bar all of plaintiff's claims." (ECF No. 6 at 1, 4). Defendant further contends that, "[a]s a matter of law, plaintiff cannot prove breach of the Settlement Agreement or reliance on the alleged misrepresentations or omissions since even if they occurred, they occurred after the Settlement Agreement was entered into." *Id.* at 5.

Plaintiff contends that the motion to dismiss should be denied because the Complaint alleges "more than enough facts to state plausible claims for breach of contract, fraud, and negligent misrepresentation against [Defendant]." (ECF No. 7 at 6). Plaintiff asserts that, in entering into the Settlement Agreement with Defendant, Plaintiff relied on Defendant's "*promise* – his representation and warranty that the balance sheet would accurately disclose all liabilities" – rather than on the balance sheet itself. *Id.* at 2. Plaintiff contends that Defendant "knew at the time that he made his representation that the balance sheet was not accurate, since SMT had failed to properly account for the guarantee to Ralphs for years." *Id.* at 6-9.

**A. Claim 1: Breach of Contract**

Defendant contends that Plaintiff "expressly waived all rights under California Civil Code Section 1542" by entering into the Settlement Agreement with Defendant, "thus extending the Mutual General Releases contained in Paragraphs 9 and 10 of the Settlement Agreement to encompass both known and unknown claims as of April 10, 2012." (ECF No. 6 at 4). Plaintiff contends that "[Defendant's] argument directly contradicts the plain terms of the Settlement Agreement, which preserves [Plaintiff]'s

right to bring claims against [Defendant] for breach of the duties and obligations, representations and warranties expressly created by this Agreement, the Accounting, the Accepted Proposal, and the New Contracts." (ECF No. 7 at 8) (quotation omitted).

Pursuant to the April 10, 2012 Settlement Agreement attached to the Complaint, SMT and Defendant were required to, *inter alia*, "prepare and deliver to [Plaintiff] an accounting concerning SMT..., which ... shall include ... an unaudited balance sheet of SMT as of February 29, 2012 ... and the related unaudited income statement for the two months then ended." (ECF No. 1-2 at 2-3, Exh. B). The Settlement Agreement also required SMT and Defendant to provide to Plaintiff "a detailed list of existing and prospective customers of SMT as of the date hereof," i.e. April 10, 2012 – the date of the Settlement Agreement's execution. *Id.* at 3. Pursuant to Paragraph 10 of the Settlement Agreement, Plaintiff released Defendant from existing or future lawsuits or liabilities, "[o]ther than the duties and obligations, representations and warranties expressly created by this Agreement, the Accounting, the Accepted Proposal and the New Contracts." *Id.* at 5-6. Paragraph 11 of the Settlement Agreement states that Plaintiff and Defendant "expressly waive all rights under Section 1542 of the California Civil Code insofar as it would otherwise apply to the general releases given in paragraphs 9 and 10 above." *Id.* at 6.

The Complaint alleges that Defendant "breached his representation [pursuant to the Settlement Agreement] by failing to disclose that SMT had agreed to guarantee payments to Ralphs and the liabilities associated therewith" for a period of three years. (ECF No. 1 at ¶ 33); *see also* ECF No. 1-1, Exh. A (contract between SMT and Ralphs). The Complaint sets forth factual allegations adequate to support a claim for breach of contract that arises from "duties and obligations, representations and warranties expressly created" by the Settlement Agreement. (ECF No. 1-2 at 5-6). Based upon the allegation of the Complaint, the general release found in Paragraph 10 of the Settlement Agreement may not extend to Plaintiff's claim for breach of contract. *See id.* at 6 (releasing Defendant from existing or future lawsuits or liabilities, "[o]ther than

the duties and obligations, representations and warranties expressly created by this Agreement, the Accounting, the Accepted Proposal and the New Contracts."). Similarly, the parties' waiver of California Civil Code Section 1542 may not bar Plaintiff's claim for breach of contract because Section 1542 only governs claims subject to a general release. *See* Cal. Civ. Code § 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.")).

In order to state a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages. *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (Cal. Ct. Appeal 2001); 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 476, p. 570.

The Complaint alleges that Defendant breached the Settlement Agreement by failing to disclose the Ralphs account, which "forced [Plaintiff] to cause its wholly-owned subsidiary Schur Consumer Products, Inc., the successor company to SMT, to pay Ralphs $638,411.05 for the first year guarantee and $842,308.00 for the second year guarantee.... The third year guarantee has not yet been calculated but will have to be paid by [Plaintiff]...." (ECF No. 1 at ¶ 25). The Complaint alleges that it has been further damaged because "Defendant's representations caused Glacier to pay a lower purchase price when purchasing SMT's assets." *Id.* at ¶ 34. Viewing the allegations of the Complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has stated factual allegations to support a plausible claim for breach of contract against Defendant.

//

//

//

**B. Claims 2-4: Fraudulent Misrepresentation, Fraudulent**

**Nondisclosure/Omissions and Negligent Misrepresentation**

Defendant contends that Plaintiff could not have relied upon the balance sheet in entering into the Settlement Agreement because the balance sheet was provided to Plaintiff after the Settlement Agreement was signed. Defendant asserts: "The delivery of the Accounting, including the Balance Sheet, was a post-settlement act. SMT/[Defendant] did not make any representations in the Settlement Agreement about SMT's contract with Ralphs." (ECF No. 8 at 2).

Plaintiff contends that, under the Settlement Agreement, Defendant "promise[d] [Plaintiff]" that, as of April 10, 2012, "all liabilities [were] accurately disclosed on the Balance Sheet." (ECF No. 7 at 4-5). Plaintiff asserts: "At the time he made that representation, however, Miller knew that the Balance Sheet was not accurate. As alleged in the Complaint, Miller was aware that for years, SMT had failed to adequately account for the 1.5 million dollar guarantee made to Ralphs." *Id.* at 5 (citing ECF No. 1 at ¶¶ 10, 13-17).

To recover for common law fraud under California law, Plaintiff must demonstrate: (1) misrepresentation, (2) knowledge of its falsity, (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage. *Lazar v. Super. Ct.*, 12 Cal.4th 631, 638, 49 Cal. Rptr.2d 377, 909 P.2d 981 (1996). "The same elements [of fraudulent misrepresentation] comprise a cause of action for negligent misrepresentation, except there is no requirement of intent to induce reliance. In both causes of action, the plaintiff must plead that he or she actually relied on the misrepresentation." *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004) (citing *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1088-89 (Cal. 1993)).

"It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirement." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003); *see also Lorenz v. Sauer*, 807 F.2d 1509, 1511-12 (9th Cir. 1987) ("Under California law, negligent misrepresentation is a species of actual fraud...."). To satisfy Rule 9(b)'s

"particularity" requirement, allegations of fraud must include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG*, 476 F.3d 756, 763 (9th Cir. 2007) (citing Fed. R. Civ. P. 9(b)).

The Complaint alleges that Defendant, in the Settlement Agreement, represented to Plaintiff that:

> (a) SMT has no liabilities [on April 10, 2012] except for liabilities set forth in the liabilities column of the Balance Sheet and trade accounts payable or accrued salary that has been incurred by SMT since the date of the Balance Sheet....
>
> (c) Other than as specifically set forth in the Accounting, SMT is not obligated to perform any development projects or installations....

(ECF No. 1-2 at 3); *see also* ECF No. 1 at ¶¶ 1, 21, 32, 39, 63.

Based upon the allegations of the Complaint and for the reasons stated above, the Court does not find that the general release provision of the Settlement Agreement bars claims two, three or four of the Complaint. *See supra* Part III.A. The Complaint alleges that Plaintiff relied on Defendant's alleged misrepresentation of accurate, up-to-date, book keeping when entering into the Settlement Agreement. The Complaint alleges that "Defendant's representations caused Glacier to pay a lower purchase price when purchasing SMT's assets." *Id.* at ¶ 34. Viewing these allegations in the light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged facts with sufficient particularity to support plausible claims against Defendant for negligent misrepresentation and fraudulent misrepresentation and omission.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss filed by Defendant Robert Miller (ECF No. 6) is DENIED.

DATED: June 5, 2013

**WILLIAM Q. HAYES**
United States District Judge